Marijan S Hucke (4615654)
cases@huckesanker.com
HUCKE & SANKER PLLC
43 West 43rd Street, Suite 363
New York, NY 10036-7424
Telephone: (201) 228-0455
Facsimile: (646) 396-0411
*Attorneys for Plaintiff*
*emoji company GmbH*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| emoji company GmbH<br>*Plaintiff*<br><br>v.<br><br>THE INDIVIDUALS, CORPORATIONS,<br>LIMITED LIABILITY COMPANIES,<br>PARTNERSHIPS, AND<br>UNINCORPORATED ASSOCIATIONS<br>IDENTIFIED ON SCHEDULE A<br>*Defendants* | **CIVIL ACTION No.**<br><br>**COMPLAINT**<br><br>**Jury Trial Requested** |

Plaintiff, EMOJI COMPANY GmbH ("EMOJI COMPANY" or "Plaintiff"), by undersigned counsel, hereby complains of the Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations and others identified in Schedule A attached hereto as **Exhibit 1** (collectively, "Defendants"), and hereby alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for preliminary and permanent injunctive relief and damages associated with the Defendants' intentional, unauthorized and unlawful use of Plaintiffs' valuable trademarks in connection with Defendants' sale and advertisement of counterfeit goods. The action arises under trademark infringement claims of Plaintiff's federally registered trademark, specifically violations of § 32 of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*. The claims also include counterfeiting of Plaintiff's federally registered trademark in violation of 15 U.S.C. §§ 1114(1)(a)(b), 1116(d); false designation of origin, passing off, and unfair competition in violation of Section 43(a) of the Trademark Act of 1946, as amended (15 U.S.C. §1125(a)); and related state and common law claims. These claims arise from the infringement of the EMOJI Mark. Defendants engage in activities such as manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, and/or selling unlicensed, counterfeit, and infringing versions of Plaintiff's EMOJI Products.

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. §1121 as an action arising out of violation of 15 U.S.C. § 1051, 1114 *et seq*.; 28 U.S.C. § 1331 and § 1338(a); pursuant to 28 U.S.C. §1338(b) as an action arising out of claims for false designation of origin and unfair competition and pursuant to 28 U.S.C. § 1332, as there is diversity between the parties and the matter in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they

are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

3.     This court has personal jurisdiction over all Defendants under N.Y.C.P.L.R. § 302(a) or in the alternative Federal Rule of Civil Procedure 4(k), given their regular business activities, solicitation, and transactions within New York and this District. Further, jurisdiction is justified over all Defendants because they transacted business and committed tortious acts within and directed to New York, and Plaintiff's claims arise from those activities. In particular, Defendants (a) transact business within New York or contract to supply goods, including counterfeit goods, in New York, (b) have committed infringement within New York and in this District, and (c) have committed infringement outside New York, which has caused injury to Plaintiff within New York, and Defendants (i) expected or should reasonably have expected such acts to have consequences in New York, and (ii) derive substantial revenue from interstate or international commerce. In particular, Defendants are reaching out to do business with New York residents by operating one or more commercial, highly interactive online storefronts through which New York residents can purchase the Infringing Products. Defendants have targeted sales from New York residents by operating online stores that offer shipping to the United States, including New York.

4.     Venue is proper in this District, *inter alia*, pursuant to 28 U.S.C. §§ 1391(b) because, upon information and belief, Defendants conduct, transact and/or solicit business in New York and a substantial part of the events giving rise to these claims arose and customer confusion is likely to occur in this District.

## INTRODUCTION

5.      Plaintiff has initiated this lawsuit against e-commerce store operators involved in the sale of unauthorized and unlicensed goods. These operators exploit Plaintiff's established reputation and goodwill by distributing counterfeit products that illegally utilize Plaintiff's federally registered trademarks (the "Counterfeit Products").

6.      The Defendants established multiple Internet stores designed to mimic selling genuine products of the Plaintiff, when in fact, they offer inferior counterfeit versions. Defendants' online stores exhibit distinct commonalities, such as design aspects and resemblances in the counterfeit items, indicating a connection between them and suggesting that the Defendants' unlawful operations stem from a shared sequence of activities. The Defendants actively try to evade accountability by hiding their identities and the full breadth and complexity of their illicit counterfeiting enterprise. To counter the Defendants' infringement of its registered trademarks and safeguard unsuspecting buyers from acquiring unauthorized goods online, Plaintiff must take legal action. Plaintiff has suffered and continues to suffer irreparable harm through customer confusion, dilution, and tarnishment of its valuable trademarks because of the defendants' conduct and seeks both injunctive relief and monetary compensation.

## PLAINTIFF

7.      Plaintiff designs, manufactures and sells products, which prominently display the internationally recognized and federally registered Plaintiff's EMOJI trademarks (collectively, the "Plaintiff's Products").  Plaintiff's Products have become very popular, driven by Plaintiff's high quality standards and distinctive design.   Among the purchasing public, genuine Plaintiff's

Products are instantly recognizable as such. In the United States and worldwide, Plaintiff's brand has come to symbolize high quality and Plaintiff's Products are well recognized.

8. Plaintiff uses a variety of distinctive marks in connection with its various products. As a result of its long-standing use, Plaintiff owns common law trademark rights. Plaintiff has also registered its trademarks with the U.S. Patent and Trademark Office for which true and correct copies of the registration certificates for U.S. Trademark Registration Nos. 4,595,110, 4,868,832, 4,893,876 5,202,078, 5,365,487, 5,415,510 5,343,650, 5,357,376, 5,643,568, 5,700,040 6,564,606, 7,527,202, 7,701,147, 7,482,133, 7,618,961, 7,618,977, 7,605,522, 7,605,527, 7,605,533, 7,584,604, 7,605,502, 7,520,579, 7,605,521, 7,482,143, 7,562,937, 7,458,125, 7,692,431, 7,562,936, 5,073,890, 4,766,492, 7,058,206, 7,562,925, 7,618,962, 7,605,520, 7,605,525, 7,605,526, 7,658,073, 7,701,146, 7,562,935, 5,706,477, 5,778,247 are included in **Exhibit 2** attached hereto (collectively referred to as "Plaintiff's Trademarks").

9. The U.S. registrations for Plaintiff's Trademarks are valid, subsisting, in full force and effect and incontestable pursuant to 15 U.S.C. § 1065. The registrations for Plaintiff's Trademarks constitute *prima facie* evidence of their validity and of Plaintiff's exclusive right to use Plaintiff's Trademarks pursuant to 15 U.S.C. § 1057(b). Plaintiff's Trademarks have been used exclusively and continuously by Plaintiff for many years and have never been abandoned.

10. Plaintiff's Trademarks are exclusive to Plaintiff and are displayed extensively on Plaintiff's Products and in Plaintiff's marketing and promotional materials. Plaintiff's Trademarks have been the subject of substantial and continuous marketing and promotion by Plaintiff at great expense. In fact, Plaintiff has expended significant resources annually in advertising, promoting and marketing featuring Plaintiff's Trademarks. Plaintiff's promotional efforts include — by way of example, but not limitation — substantial print media, a website, social media sites, and point

of sale materials.  Because of these and other factors, Plaintiff's name and Plaintiff's Trademarks have become famous worldwide.

11.     Plaintiff's Trademarks are distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff and are manufactured to Plaintiff's quality standards. Whether Plaintiff manufactures the products itself or licenses others to do so, Plaintiff has ensured that products bearing its trademarks are manufactured to the highest quality standards.  Plaintiff's Trademarks have achieved fame and recognition, which has only added to the inherent distinctiveness of the marks.  As such, the goodwill associated with Plaintiff's Trademarks are incalculable and of inestimable value to Plaintiff.

12.     Plaintiff's Trademarks qualify as famous marks, as used in 15 U.S.C. §1125 (c)(1) and have been continuously used and never abandoned.

13.     Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting its Trademarks.  As a result, products bearing the Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiff.

14.     In early 2013, Plaintiff, through its predecessor, created an iconic lifestyle brand that would take graphic icons and pictograms, usually encountered in the digital world, and transpose those graphic icons and pictograms into the real world through the use of such graphic icons and pictograms on physical products.

15.     Plaintiff adopted the name "EMOJI" for its iconic lifestyle brand ("emoji® Brand") and secured the trademark rights in and to the wordmark "EMOJI" all over the globe by 2013.  For example, Plaintiff has protected its valuable rights by filing for and obtaining, among other things, trademark applications for the wordmark "EMOJI" for various classes throughout the world,

including, but not limited to territories such as the United States, United Kingdom, European Union, Canada, Australia, Japan, South Korea, China, Hong Kong, Singapore, India, Brazil, Mexico, Chile, Argentina, Colombia, Russia, Israel, Turkey, New Zealand, Pakistan, Indonesia, Thailand, Taiwan, Malaysia, Vietnam, Philippines, Bangladesh, Iran, Ukraine, Serbia, Bosnia & Herzegovina, Morocco, South Africa, Egypt, Switzerland, Norway, United Arab Emirates and many more (collectively, "emoji® Marks").

16.     Plaintiff officially launched the iconic lifestyle brand in the United States at the Las Vegas Licensing Expo in June 2015 and has teamed up with reputable licensing partners from all over the world, thereby establishing widespread recognition of the emoji® Brand, including the emoji® Marks (covering almost forty-five (45) International Classes throughout the world) and more than twenty thousand (20,000) different copyrighted high resolution graphic icons.

17.     Plaintiff offers a licensing package for the creation of products, for promotional and advertising purposes, that includes the emoji® Marks and its high resolution graphic icons, which are developed in-house ("emoji® IP"), and have entered into more than one thousand (1,000) license agreements with a multitude of global partners.

18.     Plaintiff's authorized licensees ("Authorized Licensee(s)") sell licensed products featuring the emoji® IP and the Relevant emoji® Mark.

19.     Licensed emoji® Products can be found in on-line and brick and mortar retail stores worldwide.

20.     Plaintiff owes a substantial amount of the success of the Licensed emoji® Products to their consumers, and word-of-mouth buzz that its consumers have generated.

21. Plaintiff, the emoji® Brand and Licensed emoji® Products have received global press and media coverage. News stories, features and posts have appeared in worldwide online platforms and publications, such as: Licensingsource.net and Licensingmag.com.

22. As a result of Plaintiff's efforts, the high quality of the Licensed emoji® Products and Plaintiff's and their Authorized Licensees' marketing and promotional efforts, extensive press and media coverage and word of mouth buzz, the emoji® Brand, the emoji® IP, the Relevant emoji® Mark and the Licensed emoji® Products have become prominently placed in the minds of the public.

23. Plaintiff's EMOJI Mark, along with the EMOJITOWN Mark, boasts significant popularity, demonstrated by their presence on Plaintiff's YouTube channel. This channel has garnered nearly 2 million subscribers and boasts almost 1 billion views across 429 videos that feature Plaintiff's EMOJI intellectual property.

24. Retailers, retail buyers, consumers, and the members of the public have become familiar with Plaintiff's emoji® Brand, emoji® IP, the Relevant emoji® Mark and the Licensed emoji® Products and have come to associate them exclusively with Plaintiff. Plaintiff has acquired a valuable reputation and goodwill among the public as a result of such association (i.e., acquired distinctiveness or secondary meaning).

25. Plaintiff has gone to great lengths to protect their interests in and to the emoji® Brand, the emoji® IP and the Relevant emoji® Mark. No one other than Plaintiff and Authorized Licensees and authorized distributors are authorized to manufacture, import, export, advertise, distribute, offer for sale, or sell any goods utilizing the emoji® IP, the Relevant emoji® Mark, or any confusingly similar marks, without the express written permission of Plaintiff.

**DEFEDANTS**

26.     Upon information and belief, Defendants are individuals and business entities who reside in the People's Republic of China or other foreign jurisdictions.  Defendants operate fully interactive commercial websites and online marketplaces under their Internet Stores. Through these operations, Defendants conduct business throughout the United States, including New York and within this Judicial District. Each Defendant targets the United States, including New York, by offering for sale and, upon information and belief, continuously selling counterfeit products to consumers within the United States, including New York and this Judicial District.

## AMAZON AND DEFENDANT'S USER ACCOUNTS

27.     Amazon serves as an online marketplace and e-commerce platform. It enables manufacturers and third-party merchants, such as the Defendants, to advertise, distribute, offer, sell, and ship their retail products directly to consumers globally, particularly to those in the U.S., including New York. These products originate primarily from China and other locations.

28.     Amazon is recognized as one of the leaders of the worldwide e-commerce and digital retail market and the company's net sales were $155.7. billion in the first quarter of 2025. Sales to the U.S. make up a significant percentage of the business done on Amazon, the North America segment sales increased 8% year-over-year to $92.9 billion.[1] As of June 12, 2025, Amazon had a market capital of $2.27 trillion, making it the forth most valuable company in the U.S.[2]

---

[1] https://ir.aboutamazon.com/news-release/news-release-details/2025/Amazon-com-Announces-First-Quarter-Results/default.aspx
[2]        https://companiesmarketcap.com/usa/largest-companies-in-the-usa-by-market-cap/?utm_source=chatgpt.com#google_vignette

29.     Chinese merchants, who recently constituted almost half of all businesses on Amazon, make up a significant portion of the third-party sellers with User Accounts and Merchant Storefronts on the platform, including the Defendants.[3]

30.     Amazon User Accounts facilitated $390 billion in sales for third-party merchants in 2021 alone..[4]

31.     Amazon aggressively uses the Internet and television, to market itself and the products offered for sale and/or sold by its third-party merchant users to potential consumers, particularly in the U.S.  In 2023 alone, Amazon spent approximately $20.3 billion on marketing.[5]

32.     Amazon faces numerous federal lawsuits against third-party merchants due to the rampant sale of counterfeit and infringing products. This astronomical problem has also been highlighted in recent news reports.[6][7]

33.     Upon information and belief, Defendants are individuals and/or businesses believed to be located in China. They conduct business in the U.S. and other countries through their User Accounts and Merchant Storefronts on Amazon, and potentially on additional, as yet undiscovered, online marketplace platforms.

34.     Defendants use their Merchant Storefronts to offer and sell consumer products, including Counterfeit Products. These products are targeted at and shipped to customers in the U.S. including New York and globally.

---

[3]     https://www.marketplacepulse.com/articles/american-sellers-lost-amazon-to-china
[4]     https://www.marketplacepulse.com/marketplaces-year-in-review-2021
[5]     chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://s2.q4cdn.com/299287126/files/doc_financials/2024/ar/Amazon-com-Inc-2023-Annual-Report.pdf
[6]     See, e.g., *Apple Inc. v. Mobile Star LLC*, No. C17-1120 RAJ (W.D. Cal. Aug. 4, 2017) and *Diamler AG v. Amazon.com, Inc.*, 16-cv-00518-RSM (W.D. Wash. Mar. 11, 2019).
[7]     https://www.pymnts.com/amazon/2025/amazon-seized-more-than-15-million-counterfeit-products-in-2024

35.     The storefronts of the Defendants exhibit unique identifiers, including design elements, and offer Counterfeit Products with similar pricing and descriptions.

36.     Defendants communicate regularly through online chatroom discussions about illegal counterfeiting activities, ongoing litigation, and potential new lawsuits.

## DEFENDANTS' UNLAWFUL CONDUCT

37.     The success of Plaintiff's brand has resulted in its counterfeiting. Plaintiff has identified numerous Online Marketplace Accounts and marketplace listings on platforms such as Amazon, including the Defendants' Internet Stores, which were offering for sale, selling, and importing counterfeit products to consumers in this Judicial District and throughout the United States. Defendants have persisted in creating the Defendants' Internet Stores. Internet websites like the Defendant Internet Stores make up an estimated $143 billion worth of counterfeit or pirated goods. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in 2024 was over $5.4 billion, an increase of 415% from fiscal year 2020. Internet websites like the Defendants' Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue.

38.     Upon information and belief, Defendants facilitate sales by designing the Defendants' Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine products. Many of the Defendants' Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards and Amazon. Defendants' Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicators

of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos.

39.     Plaintiff has not licensed nor authorized Defendants to use its Trademarks and none of the Defendants are authorized retailers of its genuine products.

40.     Upon information and belief, Defendants deceive unknowing consumers by using Plaintiff's Trademarks without authorization within the content, text, and/or meta tags of their websites to attract various search engines looking for websites relevant to consumer searches for Plaintiff's products.  Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendants' Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for Plaintiff's genuine products.   Further, Defendants utilize similar illegitimate SEO tactics to propel new Online Marketplace Accounts to the top of search results after others are shut down.  As such, Plaintiff seeks to disable Internet Stores owned by Defendants through which their counterfeit products are sold.

41.     Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Internet Stores. For example, many of Defendants' names and physical addresses used to register their Online Marketplace Accounts are incomplete, contain randomly typed letters, or fail to include cities or states.  Other Online Marketplace Accounts use privacy services that conceal the owners' identity and contact information.  Upon information and belief, some of the tactics used by the Defendants to conceal their identities and the scope and interworking of their counterfeit operations to avoid being shut down include regularly creating new websites and Online Marketplace Accounts on

various platforms using the identities listed in Schedule A, as well as other fictitious names and addresses.

42.      Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendants' Internet Stores.  For example, some of the Defendants' websites have identical layouts, even though different aliases were used to register their respective Online Marketplace Accounts.  In addition, the counterfeit products for sale in the Defendants' Internet Stores bear similarities and indicia of being related to one another, suggesting that the counterfeit products were manufactured by a common source and that Defendants are interrelated. The Defendants' Internet Stores also include other notable common features, including use of the same Online Marketplace Accounts registration patterns, unique shopping cart platforms, similar payment and check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

43.      In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts.  For example, when counterfeiters like Defendants receive notice of a lawsuit they will often register new Online Marketplace Accounts under new aliases and move website hosting to rogue servers located outside the United States once notice of a lawsuit is received.  Rogue servers are notorious for ignoring take down demands sent by brand owners.  Counterfeiters will also ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.  A 2012 U.S. Customs and Border Protection

report on seizure statistics indicated that the Internet has fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

44.    Further, counterfeiters such as Defendants typically operate multiple credit cards, merchant and Amazon accounts behind layers of payment gateways so that they can continue to operate in spite of Plaintiff's enforcement efforts.  Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their Amazon accounts to off-shore bank accounts outside the jurisdiction of this Court.  Indeed, analysis of Amazon and transaction logs from prior similar cases indicate that offshore counterfeiters regularly move funds from U.S.-based Amazon accounts to accounts outside the jurisdiction of this Court.

45.    On information and belief, Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn, kaidianyo.com and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation and potential new lawsuits.

46.    Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use Plaintiff's Trademarks in connection with the advertisement, distribution, offering for sale, and sale of counterfeit products into the United States and New York over the Internet.  Each Defendants' Internet Stores offer shipping to the United States, including New York and, on information and belief, each Defendant has offered to sell counterfeit products into the United States, including New York.

47.    Defendants' use of Plaintiff's Trademarks in connection with the advertising, distribution, offering for sale, and sale of counterfeit products, including the sale of counterfeit products into New York, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## TRADEMARK COUNTERFEITING
(Under Sections 32, 34 and 35 of the Lanham Act,
15 U.S.C. §§ 1114, 1116(d) and 1117(b)-(c))

48.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

49.     Plaintiff is the exclusive owner of the all right and title to the EMOJI Mark.

50.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of Plaintiff's registered Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiff's Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiff's products provided under its Trademarks.

51.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with Plaintiff's trademarks without Plaintiff's permission.

52.     Plaintiff is the registered owner of Plaintiff's Trademarks (**Exhibit 2**).  The United States Registrations for Plaintiff's Trademarks are in full force and effect.  Upon information and belief, Defendants have knowledge of Plaintiff's rights in its Trademarks and are willfully infringing and intentionally using Plaintiff's Trademarks on counterfeit products. Defendants' willful, intentional, and unauthorized use of Plaintiff's Trademarks are likely to cause and are causing confusion, mistake, and deception as to the origin and quality of the counterfeit products among the general public.

53.     Without Plaintiff's authorization or consent, with knowledge of Plaintiff's well-known and prior rights in its EMOJI Mark and with knowledge that Defendants' Counterfeit

Products bear counterfeit marks, Defendants intentionally reproduced, copied and/or colorably imitated the EMOJI Mark and/or used spurious designations that are identical with, or indistinguishable from, the EMOJI Mark on or in connection with the manufacturing, import, export, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products.

54.     Defendants have manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale and/or sold their Counterfeit Products to the purchasing public in direct competition with Plaintiff, in or affecting interstate commerce, and/or have acted with reckless disregard of Plaintiff's rights in and to the EMOJI Mark through their participation in such activities.

55.     Defendants have applied their reproductions, counterfeits, copies and colorable imitations of the EMOJI Mark to packaging, point-of-purchase materials, promotions and/or advertisements intended to be used in commerce upon, or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling of Defendants' Counterfeit Products, which is likely to cause confusion, mistake, and deception among the general purchasing public as to the origin of the Counterfeit Products, and is likely to deceive consumers, the public and the trade into believing that the Counterfeit Products sold by Defendants originate from, are associated with or are otherwise authorized by Plaintiff, thereby making substantial profits and gains to which they are not entitled in law or equity.

56.     Defendants' unauthorized use of the EMOJI Mark on or in connection with the Counterfeit Products was done with notice and full knowledge that such use was not authorized or

licensed by Plaintiff or its authorized agents and with deliberate intent to unfairly benefit from the incalculable goodwill inherent in the EMOJI Mark.

57.    Defendants' actions constitute willful counterfeiting of the EMOJI Mark in violation of 15 U.S.C. §§ 1114(1)(a)-(b), 1116(d) and 1117(b)-(c).

58.    As a direct and proximate result of Defendants' illegal actions alleged herein, Defendants have caused substantial monetary loss and irreparable injury and damage to Plaintiff, its business, its reputation and its valuable rights in and to the EMOJI Mark and the goodwill associated therewith, in an amount as yet unknown, but to be determined at trial, for which Plaintiff has no adequate remedy at law, and unless immediately enjoined, Defendants will continue to cause such substantial and irreparable injury, loss and damage to Plaintiff and its valuable EMOJI Mark.

59.    Based on Defendants' actions as alleged herein, Plaintiff is entitled to injunctive relief, damages for the irreparable harm that Plaintiff has sustained, and will sustain, as a result of Defendants' unlawful and infringing actions, as alleged herein, and all gains, profits and advantages obtained by Defendants as a result thereof, enhanced discretionary damages, treble damages and/or statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold, offered for sale or distributed and reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**INFRINGEMENT OF REGISTERED TRADEMARK**
(Under Sections 32(a) of the Lanham Act,
15 U.S.C. § 1114)

60.    Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

61.    Plaintiff has continuously used the EMOJI Mark in interstate commerce as reflected in the registration certificate attached hereto as **Exhibit 2**.

62.     Plaintiff, as owner of all right, title and interest in and to the EMOJI Mark, has standing to maintain an action for trademark infringement under 15 U.S.C. § 1114.

63.     Defendants were, at the time they engaged in their actions as alleged herein, actually aware that Plaintiff is the owner of the federal trademark registration for the EMOJI Mark.

64.     Defendants did not seek and thus inherently failed to obtain consent or authorization from Plaintiff, as the registered trademark owner of the EMOJI Registration, to deal in and commercially manufacture, import, export, advertise, market, promote, distribute, display, retail, offer for sale and/or sell the EMOJI Products and/or related products bearing the EMOJI Mark into the stream of commerce.

65.     Defendants knowingly and intentionally manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale and/or sold Counterfeit Products, bearing and/or utilizing marks that are reproductions, counterfeits, copies and/or colorable imitations of the EMOJI Mark and/or which are identical or confusingly similar to the EMOJI Registration.

66.     Defendants knowingly and intentionally reproduced, copied and colorably imitated the EMOJI Mark and applied such reproductions, copies or colorable imitations to packaging, wrappers, receptacles, online listings and/or advertisements used in commerce upon, or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or sale of Defendants' Counterfeit Products.

67.     Defendants were, at the time they engaged in their illegal and infringing actions as alleged herein, actually aware that Plaintiff is the owner of all rights in and to the EMOJI Mark.

68.     Defendants' egregious and intentional use of the EMOJI Mark in commerce on or in connection with Defendants' Counterfeit Products has caused, and is likely to continue to cause,

actual confusion and mistake, and has deceived, and is likely to continue to deceive, the general purchasing public as to the source or origin of the Counterfeit Products, and is likely to deceive the public into believing that Defendants' Counterfeit Products are Plaintiff's EMOJI Products or are otherwise associated with, or authorized by, Plaintiff.

69.     Defendants' actions have been deliberate and committed with knowledge of Plaintiff's rights and goodwill in the EMOJI Mark, as well as with bad faith and the intent to cause confusion, mistake and deception.

70.     Defendants' continued, knowing, and intentional use of the EMOJI Mark without Plaintiff's consent or authorization constitutes intentional infringement of Plaintiff's federally registered EMOJI Registration in violation of §32 of the Lanham Act, 15 U.S.C. § 1114.

71.     As a direct and proximate result of Defendants' illegal and infringing actions as alleged herein, Plaintiff has suffered substantial monetary loss and irreparable injury, loss and damage to its business and its valuable rights in and to the EMOJI Mark and the goodwill associated therewith in an amount as yet unknown, but to be determined at trial, for which Plaintiff has no adequate remedy at law, and unless immediately enjoined, Defendants will continue to cause such substantial and irreparable injury, loss and damage to Plaintiff and the valuable EMOJI Mark.

72.     Based on Defendants' actions as alleged herein, Plaintiff is entitled to injunctive relief, damages for the irreparable harm that Plaintiff has sustained, and will sustain, as a result of Defendants' unlawful and infringing actions as alleged herein, and all gains, profits and advantages obtained by Defendants as a result thereof, enhanced discretionary damages, as well as other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, and reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**FALSE DESIGNATION OF ORIGIN,**

**PASSING OFF,**
**UNFAIR COMPETITION**
(Under Section 43(a) of the Lanham Act,
15 U.S.C. §1125(a))

73.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

74.     Plaintiff, as the owner of all right, title and interest in and to the EMOJI Mark, has standing to maintain an action for false designation of origin and unfair competition under the Federal Trademark Statute, Lanham Act § 43(a) (15 U.S.C. § 1125).

75.     The EMOJI Mark is inherently distinctive and/or has acquired distinctiveness.

76.     Defendants knowingly and willfully used in commerce products and/or packaging designs that are identical or confusingly similar to, and constitute reproductions of the EMOJI Mark and affixed, applied and used false designations of origin and false and misleading descriptions and representations on or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or sale of Counterfeit Products with the intent to cause confusion, to cause mistake and to deceive the purchasing public into believing, in error, that Defendants' substandard Counterfeit Products are EMOJI Products or related products, and/or that Defendants' Counterfeit Products are authorized, sponsored, approved, endorsed or licensed by Plaintiff and/or that Defendants are affiliated, connected or associated with Plaintiff, thereby creating a likelihood of confusion by consumers as to the source of such Counterfeit Products, and allowing Defendants to capitalize on the goodwill associated with, and the consumer recognition of, the EMOJI Mark, to Defendants' substantial profit in blatant disregard of Plaintiff's rights.

77.     By manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit

Products that are identical to, confusingly similar to or which constitute colorable imitations of Plaintiff's EMOJI Products using marks that are identical and/or confusingly similar to, or which constitute colorable imitations of the EMOJI Mark, Defendants have traded off the extensive goodwill of Plaintiff and its EMOJI Products and did in fact induce, and intend to, and will continue to induce customers to purchase Defendants' Counterfeit Products, thereby directly and unfairly competing with Plaintiff. Such conduct has permitted and will continue to permit Defendants to make substantial sales and profits based on the goodwill and reputation of Plaintiff and its EMOJI Mark, which Plaintiff has amassed through its nationwide marketing, advertising, sales and consumer recognition.

78. Defendants knew, or by the exercise of reasonable care should have known, that their adoption and commencement of and continuing use in commerce of marks that are identical or confusingly similar to and constitute reproductions of the EMOJI Mark would cause confusion, mistake or deception among purchasers, users and the public.

79. Upon information and belief, Defendants' aforementioned wrongful actions have been knowing, deliberate, willful, intended to cause confusion, to cause mistake and to deceive the purchasing public and with the intent to trade on the goodwill and reputation of Plaintiff's EMOJI Products and EMOJI Mark.

80. As a direct and proximate result of Defendants' aforementioned actions, Defendants have caused irreparable injury to Plaintiff by depriving Plaintiff of sales of its EMOJI Products and by depriving Plaintiff of the value of its EMOJI Mark as a commercial asset in an amount as yet unknown, but to be determined at trial, for which it has no adequate remedy at law, and unless immediately restrained, Defendants will continue to cause substantial and irreparable injury to Plaintiff and the goodwill and reputation associated with the value of the EMOJI Mark.

81.     Based on Defendants' wrongful conduct, Plaintiff is entitled to injunctive relief as well as monetary damages and other remedies as provided by the Lanham Act, including damages that Plaintiff has sustained and will sustain as a result of Defendants' illegal and infringing actions as alleged herein, and all gains, profits and advantages obtained by Defendants as a result thereof, enhanced discretionary damages and reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### VIOLATION OF DECEPTIVE ACTS AND
### PRACTICES UNLAWFUL
(N.Y. Gen. Bus. Law § 349)

82.     Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs.

83.     Through Defendant's unlawful, unauthorized, and unlicensed use of the Infringing Mark on or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, retailing, offering for sale, selling, and/or otherwise dealing in Infringing Products which are identical and/or confusingly similar to Plaintiffs' Licensed emoji® Products, Defendant has engaged in consumer-oriented conduct that has adversely affected the public interest and has resulted in injury to consumers in New York.

84.     Defendant's aforementioned conduct was and is a willful and deliberate attempt to mislead consumers and constitutes the use of deceptive acts or practices in the conduct of business, trade or commerce.  Such conduct has deceived and materially misleads, or has a tendency to deceive and materially mislead the consuming public and has injured, and will continue to injure Plaintiffs' business, reputation and goodwill in violation of N.Y. Gen, Bus. Law § 349. 73. As a result of Defendant's actions alleged herein, Plaintiffs have suffered, and will continue to suffer, irreparable harm for which they have no adequate remedy at law.

85.    Pursuant to N.Y. Gen. Bus. Law. § 349(h), Plaintiffs are entitled to enjoin Defendant's unlawful conduct as well as obtain damages in an amount to be determined at trial, costs, disbursements and attorney's fees.

## FIFTH CAUSE OF ACTION
## FALSE ADVERTISING UNLAWFUL
(N.Y. Gen. Bus. Law § 350)

86.    Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs.

87.    Without the authorization of Plaintiffs, Defendant has used the Infringing Mark and/or marks that are identical and/or confusingly similar to Plaintiffs' Relevant emoji® Mark in connection with the advertising, marketing, promoting, distributing, displaying, retailing, offering for sale, selling and/or otherwise dealing in the Infringing Products, which are identical and/or confusingly similar to Plaintiffs' Licensed emoji® Products, thereby causing confusion, mistake and deceiving consumers and the public as to the source, origin, sponsorship, or quality of Defendant's Infringing Products.

88.    Defendant's aforementioned willful and intentional conduct constitutes false advertising in the conduct of any business, trade or commerce and has injured, and will continue to injure Plaintiffs' business, reputation and goodwill in violation of N.Y. Gen, Bus. Law § 350.

89.    As a result of Defendant's actions alleged herein, Plaintiffs have suffered, and will continue to suffer irreparable harm for which they have no adequate remedy at law.

90.    Pursuant to N.Y. Gen. Bus. Law. § 350(e), Plaintiffs are entitled to enjoin Defendant's unlawful conduct as well as obtain damages in an amount to be determined at trial, costs, disbursements and attorney's fees.

## SIXTH CAUSE OF ACTION

## UNFAIR COMPETITION
### (New York Common Law)

91.     Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs.

92.     By manufacturing, importing, exporting and/or assisting and encouraging third parties to manufacture, import, export and by themselves advertising, marketing, promoting, distributing, displaying, retailing, offering for sale, selling and/or otherwise dealing in the Infringing Products, Defendant has traded off the extensive goodwill of Plaintiffs and their Licensed emoji® Products to induce and did induce, and will continue to induce customers to purchase its Infringing Products, thereby directly competing with Plaintiffs.  Such conduct has permitted, and will continue to permit Defendant to make substantial sales and profits based on the goodwill and reputation of Plaintiffs, which it has amassed through its nationwide marketing, advertising, sales and consumer recognition.

93.     Defendant's advertising, marketing, promoting, distributing, displaying, retailing, offering for sale, selling and/or otherwise dealing in the Infringing Products was and is in violation and derogation of Plaintiffs' rights and is likely to cause confusion, cause mistake and to deceive consumers and the public as to the source, origin, sponsorship, or quality of Defendant's Infringing Products.

94.     Defendant knew, or by the exercise of reasonable care should have known, that its advertising, marketing, promoting, distributing, displaying, retailing, offering for sale, selling and/or otherwise dealing in the Infringing Products and its continuing advertising, marketing, promoting, distributing, displaying, retailing, offering for sale, selling and/or otherwise dealing in the Infringing Products would cause confusion, cause mistake or deceive purchasers, users and the public.

95.     Upon information and belief, Defendant's aforementioned wrongful actions have been knowing, deliberate, willful, intended to cause confusion, to cause mistake and to deceive, in blatant disregard of Plaintiffs' rights, and for the wrongful purpose of injuring Plaintiffs and their competitive position while benefiting Defendant.

96.     As a direct and proximate result of Defendant's aforementioned wrongful actions, Plaintiffs have been, and will continue to be, deprived of substantial sales of their Licensed emoji® Products in an amount as yet unknown but to be determined at trial, and have been, and will continue to be deprived of the value of their Relevant emoji® Mark as a commercial asset, in an amount as yet unknown but to be determined at trial.

97.     Plaintiffs have no adequate remedy at law for Defendant's continuing violation of its rights set forth above.  Plaintiffs seek injunctive relief, an order granting Plaintiffs' damages and Defendant's profits stemming from its infringing activities, and exemplary or punitive damages for Defendant's intentional misconduct.  Plaintiffs seek exemplary or punitive damages for Defendant's intentional misconduct.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
(New York Common Law)

98.     Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs.

99.     By virtue of the egregious and illegal acts of Defendant as described herein, Defendant has been unjustly enriched in an amount to be proven at trial.

100.     Defendant's retention of monies gained through its deceptive business practices, infringement, acts of deceit and otherwise would serve to unjustly enrich Defendant and would be contrary to the interests of justice.

**DAMAGES AND PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, inclusive, and each of them, as follows:

1) For a preliminary and permanent injunction by this Court enjoining and prohibiting Defendants, or their agents, and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns and entities owned or controlled by Defendants, and all those in active concert or participation with Defendants, and each of them who receives notice directly or otherwise of such injunction from:

   a) manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products;

   b) directly or indirectly infringing in any manner Plaintiff's EMOJI Marks;

   c) using any reproduction, counterfeit, copy or colorable imitation of Plaintiff's EMOJI Marks to identify any goods or services not authorized by Plaintiff;

   d) using Plaintiff's EMOJI Marks or any other marks that are confusingly or substantially similar to the EMOJI Marks, on or in connection with Defendants' manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products;

   e) using any false designation of origin or false description, or engaging in any action which is likely to cause confusion, cause mistake and/or to deceive members of the trade and/or the public as to the affiliation, connection or association of any product manufactured, imported, exported, advertised, marketed, promoted, distributed,

displayed, offered for sale or sold by Defendants with Plaintiff, and/or as to the origin, sponsorship or approval of any product manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale or sold by Defendants and Defendants' commercial activities by Plaintiff;

f) engaging in the unlawful, unfair or fraudulent business acts or practices, including, without limitation, the actions described herein, including the of advertising and/or dealing in any Counterfeit Products;

g) engaging in any other actions that constitute unfair competition with Plaintiff;

h) engaging in any other act in derogation of Plaintiff's rights;

i) secreting, concealing, destroying, altering, selling off, transferring or otherwise disposing of and/or dealing with: (i) Counterfeit Products; (ii) any computer files, data, business records, documents or any other records or evidence relating to Defendants' User Accounts or Merchant Storefronts, Defendants' Assets from or to Defendants' Financial Accounts and the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products;

j) from secreting, concealing, transferring, disposing of, withdrawing, encumbering or paying any of Defendants' Assets from or Defendants' Financial Accounts until further ordered by this Court;

k) effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in any final judgment or order in this action;

l) providing services to Defendants, Defendants' User Accounts and Defendants' Merchant Storefronts, including, without limitation, continued operation of Defendants' User Accounts and Merchant Storefronts; and

m) instructing any other person or entity to engage or perform any of the activities referred to in subparagraphs (a) through (l) above; and

2) For an award of Defendants' profits and Plaintiff's damages pursuant to 15 U.S.C. § 1117(a), enhanced discretionary damages under 15 U.S.C. § 1117(a) and treble damages in the amount of a sum equal to three (3) times such profits or damages, whichever is greater, pursuant to 15 U.S.C. § 1117(b) for willfully and intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark in violation of 15 U.S.C. § 1114(1)(a);

3) In the alternative to Defendants' profits and Plaintiff's actual damages, enhanced discretionary damages and treble damages for willful use of a counterfeit mark in connection with the sale, offering for sale or distribution of goods or services, for statutory damages pursuant to 15 U.S.C. § 1117(c) in the amount of not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale or distributed, as the Court considers just, which Plaintiff may elect prior to the rendering of final judgment;

4) For an award of Defendants' profits and Plaintiff's damages in an amount to be proven at trial for willful trademark infringement of Plaintiff's federally registered EMOJI Marks, and such other compensatory damages as the Court determines to be fair and appropriate pursuant to 15 U.S.C. § 1117(a);

5) For an award of Defendants' profits and Plaintiff's damages pursuant to 15 U.S.C. § 1117(a) in an amount to be proven at trial and such other compensatory damages as the Court determines to be fair and appropriate pursuant to 15 U.S.C. § 1117(a) for false designation of origin and unfair competition under 15 U.S.C. §1125(a);

6) For an award of damages to be proven at trial for common law unfair competition;

7) For an order of the Court requiring that Defendants recall from any distributors and retailers and deliver up to Plaintiff for destruction any and all Counterfeit Products and any and all packaging, labels, tags, advertising and promotional materials and any other materials in the possession, custody or control of such distributors and retailers that infringe Plaintiff's EMOJI Marks, or bear any marks that are confusingly or substantially similar to the EMOJI Marks;

8) For an order of the Court requiring that Defendants deliver up for destruction to Plaintiff any and all Counterfeit Products and any and all packaging, labels, tags, advertising and promotional materials and any other materials in the possession, custody or control of Defendants that infringe Plaintiff's EMOJI Marks, or bear any marks that are confusingly or substantially similar to the EMOJI Marks pursuant to 15 U.S.C. § 1118;

9) For an order from the Court requiring that Defendants provide complete accountings for any and all monies, profits, gains and advantages derived by Defendants from their manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, sale and/or otherwise dealing in the Counterfeit Products as described herein, including prejudgment interest;

10) For an order from the Court that an asset freeze or constructive trust be imposed over any and all monies, profits, gains and advantages in Defendants' possession which rightfully belong to Plaintiff;

11) For an award of exemplary or punitive damages in an amount to be determined by the Court;

12) For Plaintiff's reasonable attorneys' fees;

13) For all costs of suit; and

14) For such other and further relief as the Court may deem just and equitable.


Respectfully Submitted,

Dated: September 10, 2025

HUCKE & SANKER PLLC

BY:___/s/ Marijan Hucke___
Marijan S. Hucke (4615654)
cases@huckesanker.com

HUCKE & SANKER PLLC
43 West 43rd Street, Suite 363
New York, NY 10036-7424
Telephone: (201) 228-0455
Facsimile: (646) 396-0411
*Attorneys for Plaintiffs*

# JURY DEMAND

Plaintiff hereby demands a jury trial on any cause of action and claim for which there is a right to a trial by jury.

Respectfully Submitted,

Dated: September 10, 2025

HUCKE & SANKER PLLC

BY: /s/ Marijan S Hucke
Marijan S. Hucke (4615654)
cases@huckesanker.com

HUCKE & SANKER PLLC
43 West 43rd Street, Suite 363
New York, NY 10036-7424
Telephone: (201) 228-0455
Facsimile: (646) 396-0411

*Attorneys for Plaintiffs*